

# Hotel Security

## Front Desk

1. No room number is to be given out for a guest. If someone comes in and asks for someone who is a guest, the front desk person is to dial the room number on the house phone and let the guest tell them their room number if he or she so desires.
2. No phone calls are to be put through to a room by room number only. The party calling must know the name of the guest. If they do not know the name of the person staying in the room, the call may not be put through. Never give a room number to anyone calling into the motel.
3. All entrance and exit doors of the motel are locked. The room keys will open any of the outside doors.
4. No one, **under any circumstances**, is to be given a key to a room who is not a registered guest. If someone requests a key who is not registered, the guest who is in the room must identify them and give permission to give them a key.

## Housekeeping

1. Pass keys for the rooms are distributed every morning by the Executive Housekeeper. Each housekeeper is responsible for that key for the day. The key must be attached to your person at all times. At the end of the day's work, the pass key must be turned in to the Executive Housekeeper who is responsible for making sure that they are locked up securely for the night.
2. While cleaning each room, your cart is to be positioned outside the room door in such a way that no one can enter the room without you knowing. Never allow anyone to come into a room while you are cleaning. Never give a key to anyone. Never let anyone into a room with your passkey. Direct anyone who asks about entry into a room to the front desk.
3. Any items found in a room that has been checked out must be reported to the Executive Housekeeper.
4. Make sure that your carts are stored properly at the end of each day. Make sure that each storage area is locked before you leave for the day.

## Maintenance

1. Keep any keys issued to you during the day on your person at all times. Turn all keys in to the front desk before leaving for the day.
2. Make sure all storage areas, and laundry rooms are locked before leaving for the day.

SAFETY AND SECURITY PROCEDURES REGARDING GUESTROOM KEYS

THE FOLLOWING RULES ARE MANDATORY.  ANY DEVIATION MAY RESULT

IN SUSPENSION, DOCKING OF PAY FOR THE DATE OF INCIDENT, AND OR

TERMINATION.

1.  ANYONE REQUESTING A KEY MUST BE A REGISTERED GUEST.  IF A
    KEY IS REQUESTED, THEN POSITIVE ID MUST BE SHOWN BEFORE
    GIVING OUT SAID KEY.

2.  IF GUEST REQUESTING KEY IS NOT REGISTERED TO THE ROOM,
    THEN THE FOLLOWING MUST BE DONE:
    A.  GET FULL NAME, GET ID, CALL GUEST IN ROOM TO VERIFY
        THIS PERSON MAY HAVE A KEY. ENTER NAME TO FOLIO.
    B.  IF NO ONE ANSWERS THE PHONE, **YOU MAY NOT, I REPEAT
        NOT GIVE THE GUEST A KEY.  EVEN IF GUEST STATES THAT
        THEY ARE FAMILY, HUSBAND, WIFE, ETC......**
    C.  IF YOU FIND THE GUEST GETTING VERY ANNOYED AND
        INSISTENT, THE ONLY OTHER ALTERNATIVE IS TO HAVE
        SECURITY (OR MGMT) GO UPSTAIRS AND KNOCK ON THE
        DOOR, **(WITHOUT—I REPEAT—WITHOUT THE PERSON
        GOING WITH YOU).**  IF GUEST IS OK WITH PERSON COMING
        TO THE ROOM, ASK IF THEY MAY HAVE A KEY.  GO BACK TO
        THE DESK AND PROCEED AS THE GUEST HAD REQUESTED
        YOU TO DO.  **IF THERE IS NO ANSWER, YOU WILL NOT
        ALLOW GUEST TO ENTER THE ROOM, WILL NOT GIVE
        THEM A KEY, AND THEY MAY WAIT IN THE SITTING ROOM
        FOR A NORMAL TIME FRAME (PER SECURITY OR MGMT)**

3.  IF THE GUEST HAS ANY COMPLAINTS REGARDING THESE RULES,
    THERE ARE TWO WAYS TO HELP RESOLVE IT.
    1.  IF YOU FEEL THREATENED BY THIS PERSON, TELL THEM YOU
        CAN CALL THE POLICE TO HELP RESOLVE THE SITUATION.
        BUT LET THEM KNOW, THAT AN OFFICER WILL NOT
        AUTHORIZE ENTRY TO THE ROOM.  THIS IS MORE OF A DETERENT
        TO GET THE PERSON TO LEAVE.

    2.  IF YOU FEEL THE PERSON IS LEGITIMATE, AND THEY REFUSE
        TO WAIT IN THE SITTING ROOM (IE: I'M TIRED, IT'S MY WIFE,
        ETC).  **YOU MUST THEN CALL EITHER LORRIE CROUCH, OR
        LILY MONTALVO.  GIVE INFORMATION AND WE WILL MAKE
        DETERMINATIONS.**



# COMFORT INN

# FRANCHISE AGREEMENT

THIS AGREEMENT entered into in Silver Spring, Maryland, as of the _9th_ day of _FEB_ 199_3_, by and between CHOICE HOTELS INTERNATIONAL, INC., a Delaware corporation, (hereinafter referred to as "Franchisor"), and __RONDAVEL MANAGEMENT CORP., a New York Corporation__

(hereinafter referred to as "Franchisee").

## WITNESSETH:

WHEREAS, Franchisor has developed a plan and system for providing to the travelling public lodging of a high standard of service, courtesy, and cleanliness, utilizing distinctive identification schemes, standards, specifications, and Proprietary Marks (as hereinafter defined) and information, all of which are referred to in this Agreement as the System, and

WHEREAS, Franchisee recognizes and agrees that participation in the Franchisor's advance reservation system, display of a sign displaying the logo and participation in the System's business referral and credit card arrangements are vital, invaluable and necessary components of the System; and

WHEREAS, Franchisee wishes to be authorized by Franchisor to use the System at the Hotel (as hereinafter defined) upon the terms and conditions contained herein; and

WHEREAS, Franchisee understands that Franchisor's standards of service, efficiency, courtesy and cleanliness and that operating and maintaining the Hotel in conformity with the System are important to the value and success of the System;

THEREFORE, Franchisor and Franchisee, in consideration of the premises and the mutual agreements herein contained do hereby agree as follows:

**1. Definitions.**

(a) "Hotel" means the building and premises to be known as __COMFORT INN__

_____ , and located at _415 East Route 59, Nanuet, NY  10954_

As used herein, such term includes the land surrounding the building and all current and future improvements, structures, fixtures, amenities, equipment, furniture and related rights, privileges and properties. Such land excludes adjoining Acreage now owed by the Franchisee.

(b) "Designated Representative", who is Franchisee's primary contact for receipt of notices and other program materials, and who is hereby granted power of attorney to act as Franchisee's representative in connection with all matters pertaining to this Agreement means _Jeff A. Weinberger_

and whose address is _29 Third Street, New City, New York  10956_

(c) "Commencement Date" means the date on which the Hotel commences operations under this Agreement, and shall be the date on which fees due pursuant to paragraph 4(b) commence accruing;

(d) "Gross Room Revenues" means all revenues derived from the rental, sale, use or occupancy of guest rooms or meeting rooms in the Hotel, including cash and credit transactions, whether or not collected by Franchisee, but excluding (1) sales taxes or other taxes which Franchisee is required by law to collect from guests or in conjunction with the rental of guest rooms or meeting rooms, (2) moneys collected for local or long distance telephone calls, or (3) vending machine, room service or food and beverage income;

(e) "Hotel Goods" means all furniture, fixtures, equipment, signs and supplies used in connection with the operation of the Hotel;

(f) "Proprietary Marks" or "Marks" means the trademarks and service marks COMFORT, COMFORT INN, COMFORT HOTEL, and COMFORT SUITES, either alone or in combination with the logotypes, signs,

emblems designated by Fra___ l to___ her with such other marks which Franchisor may from time to time authorize in writing for use ___ ___nec__ n with the System;

   (g) "Specified Room, ___unt" m__ns the number of rentable sleeping rooms in the Hotel, which shall be ___100___ .

### 2. Grant of License.

Franchisor hereby grants to Franchisee a non-exclusive license to use the System in the operation of the Hotel only and at no other location.

### 3. Term of Agreement.

The term of this Agreement shall commence on the date hereof and shall expire on the twentieth (20th) anniversary of the Commencement Date, unless earlier terminated in accordance with the terms of this Agreement. Notwithstanding the foregoing, either party may terminate this Agreement, without cause and as a matter of right, on the   5th,   * anniversary of the Commencement Date by giving no less than three (3) months prior written notice;   *10th or 15th      Franchisor shall give no less than three (

### 4. Fees and Reports. months prior written notice and Franchisee shall give no less than

   (a) Affiliation Fee. Franchisee will pay to Franchisor a nonrefundable affiliation fee of $ _30,000.00_ upon execution of this Agreement. The Affiliation Fee shall be fully earned by Franchisor upon execution of this Agreement.

   (b) Royalty Fee. Franchisee agrees to pay to Franchisor, monthly, a royalty: for the first calendar month or portion thereof in which the Hotel commences operations hereunder, a sum equal to $ *    times the   * 24.00 Specified Room Count, and for each subsequent month, a sum equal to 4% of the Gross Room Revenues for the preceding month.

   (c) Marketing Fees.

      (1) Franchisee agrees to pay to Franchisor, monthly, a marketing assessment: for the first calendar month of operation hereunder or portion thereof, a sum equal to $ * *  times the Specified Room Count,  * * 8.00 and for subsequent months, a sum equal to 1.3% of the preceding month's Gross Room Revenues. In addition, Franchisee agrees to pay to Franchisor, commencing with the Commencement Date, a supplemental marketing fee equal to 28 cents per day times the Specified Room Count.

      (2) Franchisee agrees that Franchisor may, at any time and from time to time during the term hereof, reasonably increase the marketing assessment and/or the supplemental marketing assessment to such extent as may be appropriate to take into account the advertising, publicity, public relations, marketing and similar needs of the System, or changes in the cost of living, provided only that any such increase is applicable to all or substantially all of the Hotels in the System in the U.S.

   (d) Reservations Fees.

      (1) Franchisee agrees to pay to Franchisor, monthly, a reservations services fee: for the first calendar * * * month of operation hereunder or portion thereof, a sum equal to $ * * *  times the Specified Room Count,  6.00 and for subsequent months, a sum equal to 1% of the preceding month's Gross Room Revenues. In addition, Franchisee agrees to pay a reservations delivered charge equal to $1.00 per room night confirmed through Franchisor's reservations system.

      (2) Franchisee agrees that Franchisor may, at any time and from time to time during the term hereof, increase any or all of the reservations fees, as Franchisor may reasonably determine to be appropriate to take into account Franchisor's cost of providing an advance reservation system and that Franchisor may change the method of calculating such fees as Franchisor may reasonably determine, provided only that any such increase is applicable to all or substantially all of the Hotels in the System in the U.S.

   (e) Payments and Interest on Delinquent Payments. Franchisor will bill Franchisee on or about the 15th day of each month for all amounts due for the current month. Franchisee agrees to pay, without offset, at Franchisor's office in Silver Spring, Maryland (or such other address as Franchisor may from time to time designate), such amounts by the 1st day of the following month. Amounts not paid when due, in addition to being a breach of the Agreement, will accrue interest from the date of delinquency at the rate of 1-1/2% per month or portion thereof, but not to exceed the maximum interest permitted by applicable laws.

   (f) Franchisee agrees to file with Franchisor, within ten days after the last day of each calendar month, a statement in the form prescribed by Franchisor showing the Hotel's Gross Room Revenues, occupancy and such other information as Franchisor may reasonably specify. Such reports shall be certified to be true and accurate by Franchisee or its duly appointed agent. If not timely submitted, Franchisor may reasonably estimate the Gross Room Revenues to prepare a provisional estimate for billing purposes and Franchisee agrees to pay a late charge equal to 1-1/2% of the preceding month's Royalty, but not less than $50, for additional accounting services caused by such delinquency;

   (g) Franchisee agrees to furnish to Franchisor, within 90 days after the end of each fiscal year during the term hereof, a profit and loss statement for such fiscal year prepared for the Hotel in accordance with the Rules and Regulations which statement shall be certified to be true and accurate by Franchisee or its duly appointed agent;

   (h) Franchisee agrees to retain at the Hotel for at least three years true and accurate accounts, books, records and data reflecting all particulars relating to room rentals, Gross Room Revenues and profitability

** twelve (12) months prior written notice of its intention to terminate this
   Agreement.

of the Hotel; to allow Franchisor and its agents to examine and audit said accounts, books, records, and data during normal business hours; and to make photocopies of such accounts, books, records and data necessary and appropriate to such examination and audit.

In the event an audit of Franchisee's accounts, books, records and data shows that the Franchisee underpaid Royalties, Marketing Fees and Reservations Services Fees, then Franchisee agrees to pay Franchisor on demand such sums as have been underpaid, plus interest at the rate referred to in paragraph 4(f). If the amount underpaid shall be equal to or greater than 5% of such fees payable during the period of such audit, Franchisee also agrees to pay the reasonable costs of the audit.

(i) Franchisee agrees to submit to Franchisor for review or auditing such other forms, reports, records, information, and data as Franchisor may reasonably designate in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Rules and Regulations or otherwise in writing;

(j) Franchisee agrees to participate in any computerized information reporting program ~~or electronic fund transfer program~~ adopted by Franchisor for the use by hotels affiliated with the System. Franchisee acknowledges that participation may require purchase of computer hardware and related telephone services at its expense. ~~In the event that Franchisor adopts an electronic fund transfer program for the payment of fees owing under this Agreement, special arrangements will be made with Franchisee's bank, and Franchisee agrees to cooperate in any steps necessary to make such arrangements.~~

5. *Franchisor's Covenants and Duties.* Franchisor covenants and agrees:

(a) to lend to Franchisee an Operations and Services Manual dealing with certain aspects of hotel management and administration, which Manual Franchisee acknowledges to be the exclusive property of Franchisor and which Franchisee agrees to maintain in strict confidence;

(b) to provide an initial orientation program for Franchisee and its employees (not to exceed three persons), it being understood and agreed that Franchisee shall pay the costs of * _____ travel expenses and living expenses incurred in connection with such program;

(c) to consult with and advise Franchisee from time to time regarding the renovations necessary to bring the Hotel into compliance with the System standards;

(d) to use the moneys collected pursuant to paragraph 4(c) for the purpose of national and international advertising, promotion, publicity, marketing research and other marketing programs and related activities of the System (and, in Franchisor's sole discretion, of other hotel systems operated by the Franchisor or its affiliates) as Franchisor may in its sole discretion from time to time determine to be necessary and appropriate. As part of the foregoing, Franchisor agrees to publish and distribute to the travelling public a directory of all hotels in good standing affiliated with the System (and, in Franchisor's sole discretion, including hotels affiliated with other systems operated by the Franchisor or its affiliates);

(e) to use the moneys collected pursuant to paragraph 4(d) for such advance reservation services for hotels affiliated with the System (and, in Franchisor's sole discretion, of other hotel systems operated by the Franchisor or its affiliates) as Franchisor may from time to time reasonably determine to be necessary and appropriate; and

(f) to periodically inspect the Hotel in order to provide Franchisee with Franchisor's evaluation of Franchisee's compliance with this Agreement and the Rules and Regulations.

6. *Franchisee's Covenants and Duties.* Franchisee covenants and agrees:

(a) to operate the Hotel strictly in conformity with the Agreement and exclusively under the Proprietary Mark set forth in paragraph 1(a), and to feature such Mark in all advertising matter, together with the distinguishing characteristics of the System prescribed by the Franchisor, or under such other name and Proprietary Mark as may be adopted by Franchisor for use in connection with the System, such that the Hotel will be recognizable by the general public as an integral part of the System;

(b) to maintain the Hotel interior and exterior, including parking and automotive areas and any food and beverage facilities located on the premises of the Hotel, in a clean, sound, and attractive condition and/or good repair at all times, and to undertake all repair, cleaning, redecoration, periodic repainting, and replacement of obsolete or outdated signs, equipment, furnishings, fixtures and furniture, and to take such other corrective action as is necessary to comply with the Rules and Regulations;

(c) to maintain and only use Hotel Goods as conform to the Rules and Regulations, and to refrain from installing or permitting to be installed at the Hotel, any Hotel Goods not meeting Franchisor's specifications;

(d) to use, in connection with the Hotel, only business stationery, business cards, marketing materials, advertising materials, printed materials and forms which meet the standards prescribed in the Rules and Regulations;

(e) to refrain from using or permitting the use of the Hotel for any purpose or activity not contemplated herein at any time without first obtaining the written consent of Franchisor; which shall not be unreasonably withheld;

(f) to cause the manager of the Hotel to attend, at Franchisee's expense, orientation programs and training programs conducted from time to time by Franchisor;

(g) to obtain and display in a prominent location at the Hotel approved by Franchisor one or more illuminated signs meeting Franchisor's specifications unless and to the extent prevented from doing so by applicable laws or regulations and to maintain such exterior signs in good working order at all times;

(h) to obtain and install at the Hotel reservations equipment meeting specifications prescribed from time to time by Franchisor, and to maintain such equipment in good working order at all times;

(i) at the date hereof, it owns the Hotel in fee or leases the Hotel pursuant to a lease not inconsistent with the terms hereof, and will continue to do so throughout the term hereof and until all obligations hereunder have been satisfied;

(j) to permit Franchisor and its agents to enter the Hotel at any reasonable time, with or without prior notice, and to inspect, photograph or videotape the Hotel, the Hotel Goods and operations therein to evaluate Franchisee's compliance with this Agreement. Franchisee agrees to cooperate with Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request. During any inspection visit, Franchisee agrees to provide one room for one night at the Hotel free of charge to Franchisor's representative. If a reinspection is required due to Franchisee's failure to comply with System standards, Franchisor may assess Franchisee a reasonable fee for such reinspection;

(k) to timely submit the Hotel's rate information and accurate descriptive information for inclusion in such directories as Franchisor may from time to time publish. If no changes are submitted, Franchisee agrees that Franchisor is authorized to publish the latest available rates and descriptive information submitted by Franchisee;

(l) to honor the terms of any discount or promotional program which Franchisor elects to offer to the public and to honor the rate quoted to any guest at the time of making an advance reservation, whether made through the advance reservation system or otherwise;

(m) to pay reasonable travel agent commissions in the form and manner specified by Franchisor in the Rules and Regulations;

(n) to use its best efforts to maximize the business conducted at the Hotel and to promote and increase the business of all hotels affiliated with the System. If it is unable to accommodate a potential guest, Franchisee agrees to refer the guest to other hotels affiliated with the System near the Hotel. In the event Franchisee refers a guest to a hotel not affiliated with the System where nearby hotels affiliated with the System have space available, Franchisee shall pay to Franchisor liquidated damages in the amount set forth in the Rules and Regulations for each such instance;

(o) to participate in the advance reservation system designated by Franchisor and to make reservations and to accept reservations in accordance with the Rules and Regulations and with procedures promulgated and/or changed by Franchisor from time to time;

(p) that it will not change the Specified Room Count without the prior written consent of Franchisor; * and    *(which shall not be unreasonably withheld for any additional rooms)

(q) to conduct all advertising and promotion of the Hotel, in any manner or medium, in a dignified manner and in conformity to such standards and requirements as may be specified in the Rules and Regulations.

7. *Proprietary Marks.*

(a) Franchisee acknowledges and will not contest Franchisor's interest in and exclusive right to the System and to the Proprietary Marks now used in connection with the System or subsequently adopted by Franchisor for use in connection with the System, and Franchisee further acknowledges and will not contest the exclusive right of Franchisor to grant to others the rights to their use at any location other than the Hotel.

(b) Franchisee agrees that its name and the name of any of its affiliates, whether a partnership, corporation, joint venture or any other type of business organization, shall not contain any Proprietary Mark owned by Franchisor or its affiliates or anything similar thereto.

(c) Franchisee acknowledges that the Proprietary Marks are and shall remain the property of Franchisor and that its use shall inure to the benefit of Franchisor. Franchisee agrees to assign and convey to Franchisor any such rights to the Proprietary Marks as Franchisee may acquire by reason of the use thereof.

(d) In the event applicable laws require or permit any registration by Franchisee of the Proprietary Marks, Franchisee agrees to comply with such laws and that such registration shall specify that Franchisee's use thereof is limited to the Hotel and shall terminate with the termination of this Agreement and no such registration shall create in Franchisee any property right in or privilege to the use of the Proprietary Marks which could survive the termination of this Agreement. Franchisee hereby appoints Franchisor or its agents as its duly authorized attorney in fact to cancel any such registration and/or assign any such registration to Franchisor upon the termination of this Agreement howsoever caused.

(e) Franchisee agrees not to interfere with the use or registration of the Proprietary Marks by Franchisor or by another franchisee of Franchisor.

(f) Franchisee agrees to promptly notify Franchisor of any suit filed or demand made against Franchisee challenging the validity of any of the Proprietary Marks and to cooperate in the defense of any such suit. Franchisor shall take such action necessary to protect and defend Franchisee against any such claim and shall defend and indemnify Franchisee against any loss, cost or expense incurred in connection therewith. Franchisee shall not settle or compromise any such claim without Franchisor's prior written consent. Franchisor reserves the right to defend, compromise or settle any such claim at Franchisor's expense, using attorneys of its own choosing, and Franchisee agrees to cooperate fully with Franchisor in connection with the defense of any such claim. Franchisee irrevocably grants Franchisor exclusive authority and power of

attorney to defend, compromise or settle all such claims, demands or suits. Notwithstanding the foregoing, Franchisor shall have no obligation to defend or indemnify Franchisee if the claim, suit or demand arises out of or relates to Franchisee's use of the Marks in violation of this Agreement.

(g) Franchisee agrees that no express or implied right is conferred hereby or herein upon Franchisee to sublicense others to use the Proprietary Marks or the System.

8. *Rules and Regulations.*

Franchisor may, from time to time, revise the contents of the Rules and Regulations, and Franchisee expressly agrees, at its own expense, to timely comply with each such revision. Franchisee shall, at all times, ensure that its copy of the Rules and Regulations are kept current and up-to-date. In the event of any dispute as to content, the terms of the master copy maintained by Franchisor at its headquarters shall be controlling.

9. *Future Additions.*
                                        • Franchisor shall not unreasonably withhold its ap-
No additional construction shall take place or substantial alterations be made with respect to the Hotel unless proval.
the same is first approved in writing by Franchisor, the plans and specifications therefor approved in writing by Franchisor, and Franchisee's payment to Franchisor of an expansion fee in an amount equal to the per-room charge then being charged for new franchises affiliated with the System. Upon completion of any such construction, the Specified Room Count shall include the additional sleeping rooms or meeting rooms, and the revenues derived from their rental, sale, use or occupancy shall be used in the calculation of fees and charges payable by Franchisee under this Agreement.

10. *Assignment.*

(a) Assignment by Franchisor. Franchisor shall have the right to assign all or any part of its rights or obligations under this Agreement to any person or legal entity. No such assignment, however, shall relieve the Franchisor of its obligations hereunder.

(b) Assignment by Franchisee. Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that Franchisor has granted this Agreement in reliance on Franchisee's business skill, financial capacity, and personal character. Accordingly, Franchisee may not sell, assign, transfer, or otherwise encumber any direct or indirect interest in the Hotel, this Agreement or any rights or obligations created hereby (including any direct or indirect interest in a corporate or partnership Franchisee) without the prior written consent of Franchisor which Franchisor may, in its sole discretion, approve or deny, provided, however, that no such consent shall be required for the sale or transfer by any party of securities in a publicly traded corporation or entity which individually, or in the aggregate with other sales or transfers by such party, constitute the sale or transfer of less than five percent of the outstanding capital stock or other equity interests in such corporation or entity and further provided that Franchisee may encumber the Hotel by granting a mortgage or deed of trust for an amount not exceeding 80% of the fair market value of the Hotel without the prior written consent of Franchisor. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor required by this paragraph is null and void, and constitutes a material breach of this Agreement for which Franchisor may then immediately terminate this Agreement.

(c) Conditions for Assignment; Approval. If a transfer, alone or together with other previous, simultaneous, or proposed transfers, would have the effect of transferring a controlling interest in the ownership of the Hotel, Franchisor may, in its sole discretion, require any or all of the following as conditions of its approval:

(1) All of Franchisee's accrued monetary obligations and all other outstanding obligations to Franchisor and its affiliates shall have been satisfied.

(2) Franchisee must cure any default under any provision of this Agreement, any amendment hereto or any other agreement between Franchisee and Franchisor, or its subsidiaries and affiliates.

(3) Franchisee shall execute a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its officers, directors, shareholders, and employees.

(4) The transferee shall execute (and, if the transferee is a corporation or partnership, such beneficial owners of a controlling interest in the transferee as Franchisor may request) at Franchisor's option, either: (1) a written assignment and assumption in a form satisfactory to Franchisor assuming and agreeing to discharge all of Franchisee's obligations under this Agreement, or (2) for a term ending on the expiration date of this Agreement, the then-current form franchise agreement being offered to new franchisees and such other ancillary agreements as Franchisor may require, which agreements shall supersede this Agreement in all respects and the terms of which may differ from the terms of this Agreement, including a higher percentage Royalty Fee.

(5) The transferee shall pay an affiliation fee not in excess of the amount then being charged by Franchisor for similar franchises.

(6) The transferee shall demonstrate, to Franchisor's satisfaction, that it meets Franchisor's educational, managerial, and business standards, possesses a good moral character, business reputation, and credit rating, and has the aptitude and ability, financial resources, and capital to successfully operate the Hotel.

(7) The transferee shall agree in writing to upgrade the Hotel, at its expense, to conform to

Franchisor's then-current standards and specifications, and shall complete the upgrading and other requirements within the time specified by Franchisor.

(8) The Franchisee shall agree to continue to be liable for all of the obligations to Franchisor in connection with the Hotel and to execute any and all instruments reasonably requested by Franchisor to evidence such liability.

(9) The transferee shall attend, at its expense, Franchisor's franchisee orientation program and shall cause its Hotel general manager to complete Franchisor's training programs then in effect for Hotel managers upon such terms and conditions as Franchisor may reasonably require.

(10) If Franchisor deems it necessary to inspect the Hotel premises as a condition for approving the proposed transfer, Franchisee shall reimburse Franchisor for reasonable costs related to such inspection.

(11) Franchisee shall agree that at least one named person or entity among Franchisee's principals must own the entire leasehold or fee interest in the Hotel premises and must continue to do so during the entire term of this Agreement.

(d) ~~Transfer Upon Death or Mental Incompetence.~~ Upon the death or mental incompetency of any person with an interest in the Hotel, the executor, administrator, or personal representative of such person shall transfer within a reasonable time, which shall not exceed six months after such death or mental incompetency, his interest to a third party approved by Franchisor. Such transfers, including transfers by devise or inheritance, shall be subject to the same conditions applicable to other transfers. However, in the case of transfer by devise or inheritance, if the heirs or beneficiaries of any such person are unable to meet these conditions, the personal representative or executor of the deceased Franchisee shall have a reasonable time to dispose of the deceased's interest in the Hotel, which disposition shall be subject to all the terms and conditions for transfers contained in this Agreement. Except as otherwise provided herein, if the interest is not disposed of within six months of the death or mental incompetency, Franchisor may ~~terminate this Agreement.~~

(e) Non-waiver of Claims. Franchisor's consent to a transfer of any interest in the Franchise granted herein shall not constitute a waiver of any claims it may have against the transferring party, including without limitation, claims for indemnification under this Agreement, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the items of this Agreement by the transferor, the transferee, or in connection with any subsequent transfer.

(f) For purposes of this paragraph, "controlling interest" shall include any general partner in a partnership Franchisee and the owner(s) of more than 50% of the voting stock of a corporate Franchisee.

## 11. Default and Termination.

(a) Franchisee Termination. If Franchisor shall be in default of its material obligations hereunder, Franchisee may, at its option and without further demands or notices, immediately declare this Agreement and license and all rights and privileges hereunder canceled and terminated if, after 30 days written notice from Franchisee, Franchisor has failed to cure a violation of any material provision, covenant, condition or agreement herein contained.

(b) Franchisor Termination.

(1) Termination with Notice. Franchisor may terminate this Agreement at any time, effective upon the date specified by written notice to Franchisee (or the earliest date permitted by applicable law) if Franchisee:

(a) Fails to submit monthly reports when due or fails to pay when due any amount under this Agreement within 10 days after written notice of default;  • material

(b) Fails fully to remedy any other breach of its obligations or warranties under this Agreement within 30 days after written notice from Franchisor specifying one or more breaches of this Agreement;

(c) Defaults in the performance of the terms and conditions of any other agreement with Franchisor or its affiliates, or any mortgage, deed of trust or lease covering the Hotel and fails to cure such default within the time permitted by the applicable instrument;

~~(d) Fails to pay its debts generally as they fall due;~~

(e) Receives two or more notices of default under this Agreement for the same or a similar cause or reason in any 6 month period, whether or not cured;

(f) Makes or made any material misstatement or omission of any fact in connection with this Agreement or any other materials submitted to Franchisor.

If the validity of the termination of this Agreement is at issue in any court, arbitration or other proceeding, the parties hereto agree that Franchisor shall not be prohibited from introducing evidence of any breach of this Agreement which is not specified in any such termination notice.

(2) Immediate Termination Effective Upon Receipt of Notice. Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, upon the occurrence of any of the following:

(a) A threat or danger to public health or safety resulting from the construction, maintenance, or operation of the Hotel;

(b) Franchisee ceases to operate the Hotel as part of the System or otherwise abandons the

Hotel, or loses the right to possession of the Hotel or otherwise forfeits the right to do or transact business in the jurisdiction where the Hotel is located;

(c) Franchisee (or, if Franchisee is a corporation or partnership, any principal of Franchisee) is convicted of a felony, a fraud, a crime involving moral turpitude or any other crime or offense that Franchisor believes is reasonably likely to have an adverse effect on the System, the Marks, the goodwill associated therewith, or Franchisor's interest therein;

(d) Franchisee or any partner or shareholder in Franchisee purports to transfer any rights or obligations under this Agreement or any interest in Franchisee without Franchisor's prior written consent, contrary to the terms of this Agreement;

(e) Franchisee knowingly maintains false books or records, submits any false reports to Franchisor, or makes any materially false statement or report in Franchisee's application to become a Franchisee of Franchisor;

(f) Franchisee fails to open the Hotel to the public as part of the System in accordance with the terms and provisions of this Agreement;

(g) Franchisee fails or refuses to procure or maintain the required insurance coverage required pursuant to this Agreement; or

(h) Franchisee becomes insolvent or makes a general assignment for the benefit of creditors; or a petition in bankruptcy is filed by Franchisee or against Franchisee and not opposed by Franchisee; or Franchisee is adjudicated as bankrupt or insolvent; or a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; or a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or a final judgment remains unsatisfied or of record for 30 days or longer (unless a supersedeas bond is filed); or the real or personal property of the Hotel shall be sold after levy thereupon by any sheriff, marshal, or constable.

(c) Suspension of Franchise Rights. For any default by Franchisee or event described in paragraph 11(b), Franchisor may at its option: (1) suspend any or all services to Franchisee, or (2) suspend Franchisee's right to use the Marks and, if this action is exercised, Franchisee shall cease using the Marks immediately at the direction of Franchisor. Franchisor shall reinstate this Agreement (or such suspended services or the right to use the Marks) if prior to any termination of this Agreement, the default is eliminated and Franchisor reasonably determines that reinstatement of this Agreement (or such suspended services or the right to use the Marks) would not cause a substantial loss of goodwill. Any suspension of services shall be effective upon receipt of written notice by Franchisee, and shall be available to Franchisor in addition to any other remedies Franchisor may have under this Agreement, including, without limitation, the right to terminate this Agreement.

(d) Remedies Available to Franchisor; Liquidated Damages Upon Default. In the event this Agreement is terminated for any reason whatsoever or services are suspended pursuant to paragraph 11(d), Franchisor shall have the right, at its option and sole discretion without being deemed liable for trespass or any other tort, to cause the electric power to any and all signs displaying the Marks at the Hotel to be disconnected and the sign faces to be removed, and Franchisor reserves the right to remove the Hotel from directories published by Franchisor and any other advertising then used by the System, and to cease Franchisee's participation in the Advance Reservations System.

In the event of termination of this Agreement pursuant to paragraph 11(b), in addition to any other remedies available under this Agreement, Franchisee shall pay to Franchisor within 30 days following the date of such event, as Liquidated Damages and not as a penalty an amount equal to the product of (1) the average Gross Room Revenues during the preceding 12 full calendar months (or such shorter period of time as the Hotel shall have been in the System) times (2) the Royalty set forth in paragraph 4(b) times (3) the number of months as equals the unexpired term of this Agreement (provided, however, that the product of (1) times (2) shall in no event be less than $50.00 times the Specified Room Count) plus any applicable taxes assessed on such payment. Payment of Liquidated Damages is in addition to all other rights of Franchisor to obtain equitable relief, to collect amounts owed it which accrued prior to termination of this Agreement, or to enforce survival of indemnification by Franchisee. The parties acknowledge that the injury caused Franchisor by Franchisee's breach is difficult or impossible to accurately estimate, that they intend to provide for compensation for damages which are not specifically ascertainable and not as a penalty. The parties agree that the stipulated method of computation constitutes a reasonable estimate of Franchisor's probable loss resulting from such breach by Franchisee.

12. *Obligations upon Termination.*

(a) Upon termination of this Agreement for any reason whatsoever, Franchisee shall, at its expense, immediately discontinue any and all use of the Proprietary Marks, or anything similar thereto in connection with the Hotel and shall thereafter refrain from identifying the Hotel as a Comfort Inn or former Comfort Inn.

(b) Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the Marks or any variation thereof or anything similar thereto, or any other Mark, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor for compliance with this obligation within 30 days after termination or expiration of the Agreement or suspension of services.

▪ number of months left until the next anniversary date

(c) Franchisee shall promptly pay all sums owing to Franchisor and its subsidiaries or affiliates, and all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of default including without limitation, all outstanding Royalty Fees, Marketing Fees, Reservations Fees and any liquidated damages.

(d) Franchisee shall pay to Franchisor all damages, costs, and expenses, including reasonable attorney's fees, incurred by Franchisor subsequent to the termination or expiration of the term in obtaining injunctive or other relief for the enforcement of any provision of this paragraph 12.

(e) Franchisee shall immediately turn over to Franchisor all manuals, records, files, instructions, correspondence and all other materials provided by Franchisor related to constructing and operating the Hotel, and all copies thereof (all of which are acknowledged to be Franchisor's property), and shall retain no copy or record of any of the foregoing, excepting only Franchisee's copy of this Agreement and of any correspondence between the parties, and of any other documents which Franchisee reasonably needs for compliance with any provision of law.

(f) The provisions of this paragraph 12 shall survive the termination of this Agreement.

13. *Insurance.*

(a) Franchisee agrees to procure and maintain in full force and affect during the entire term of this Agreement, at Franchisee's sole cost and expense, all-risk physical damage coverage, insuring the Hotel for an amount not less than 80% of the replacement cost thereof as well as full coverage for 12 months of Business Interruption. In the event of damage or destruction to the Hotel, unless mortgagee provisions otherwise, the proceeds of any such insurance shall be used to repair or restore the Hotel in accordance with plans and specifications prepared by Franchisee and approved in writing by Franchisor. Such insurance shall contain a waiver of subrogation in favor of those parties set forth in paragraph 13(b).

(b) Franchisee agrees to procure and maintain in full force and affect during the entire term of this Agreement, at Franchisee's sole cost and expense, Commercial Automobile and Comprehensive General Liability Insurance Policies written on an occurrence form protecting Franchisee, with the Franchisee as the named insured and Franchisor, Manor Care, Inc., other subsidiaries of Manor Care, Franchisor's agents, servants, employees, officers, and directors as additional insureds, from and against all types of liabilities, including, but not limited to, personal injury and property damage of any nature, together with the costs and expenses of the defense and/or adjustment thereof, without exception, arising out of or in any way related to any operation or activity conducted under this Agreement and/or of the Hotel, inclusive of, but not limited to, adjacent areas. Such policies shall respond to lawsuits or actions brought anywhere in the world. Such policies shall provide limits of not less than $5,000,000 ($10,000,000 if the Hotel has 6 or more stories) per occurrence and shall be accompanied by a waiver of subrogation. These total minimum limits can be provided through a combination of primary and umbrella policies.

Comprehensive General Liability coverages shall include, without limitation, Broad Form Contractual, Products and Completed Operations, Independent Contractors, Personal Injury, Broad Form Property Damage, Extended Bodily Injury, Owner's and Contractor's Protective, and Host Liquor Liability. In addition, if alcoholic beverages are sold at the Hotel, Dram Shop/Liquor Liability Insurance shall also be provided. The Automobile Liability Policy will cover owned, hired and non-owned vehicles.

Furthermore, the Hotel shall also provide statutory Workers Compensation and Employers Liability Insurance with minimum Employers Liability limits of (by accident) $100,000 and (by disease) $100,000.

Franchisor may, from time to time, during the term of this Agreement, at its sole option, require that the minimum limits of insurance coverage, as aforesaid, be reasonably increased in any area in amounts determined solely by Franchisor and Franchisee hereby agrees to comply with such requirements, at Franchisee's sole cost and expense, and to deliver evidence of such compliance to Franchisor within ten (10) days of receipt of written demand for an increase in said insurance by or on behalf of Franchisor.

The foregoing insurance shall be placed with an insurance company or companies satisfactory to Franchisor.

(c) Franchisee agrees to furnish to Franchisor within ten (10) days after the date of this Agreement certificates of such insurance indicating thereon the applicable Franchise Code set forth on page 1 of this Agreement, the name and address of the Hotel and that the Franchisor is an additional insured, together with evidence showing that the premiums thereof have been paid. Additionally, evidence of renewal will be furnished Franchisor prior to the expiration date of such insurance. Such policy or policies shall stipulate that Franchisor shall receive a thirty (30) day written notice of cancellation or reduction in coverage or other alteration of the policy or policies.

(d) In the event that Franchisee fails to comply with the provisions of this paragraph, Franchisor may, at its option, without notice, in addition to such other rights and remedies which it may have, procure and maintain such insurance and charge the full premiums thereof to Franchisee or it may immediately terminate this Agreement.

(e) The procuring and maintenance of such insurance and the performance by Franchisor of Franchisee's obligations under this Agreement shall not relieve Franchisee of any liability imposed by or under the provisions set forth in paragraph 14 of this Agreement.

### 14. Indemnification.

Franchisee agrees to defend, indemnify and hold harmless Franchisor, its officers, directors, agents and employees from any loss, cost, damage, expense and liability, including reasonable attorneys' fees and any court costs, by reason of damage or loss, including personal injury, of whatsoever nature or kind, arising from or connected with the business of the Hotel or any department thereof, or operated in conjunction therewith, or out of, or as a result of, any error, omission, act or failure on the part of Franchisee, its agents or employees, except where such loss, costs, damage expense or liability is proximately caused by negligence of Franchisor, its officers, directors, agents or employees.

### 15. Casualty.

In the event the Hotel is damaged by fire or other casualty, Franchisee shall expeditiously repair the damage. If the damage or repair requires closing the Hotel, Franchisee shall immediately notify Franchisor, shall repair or rebuild the Hotel in accordance with the Rules and Regulations, shall commence reconstruction within four months after closing, and shall reopen the Hotel for continuous business operations as soon as practicable (but in any event within 12 months after closing of the Hotel), giving Franchisor at least 30 days' prior written notice of the date of reopening.

### 16. Notices.

All notices required or permitted under this Agreement shall be in writing and, until a different address has been designated by written notice to the other party, shall be personally delivered or mailed by registered or certified mail, return receipt requested, or by any nationally recognized courier service, to Choice Hotels International, Inc., 10750 Columbia Pike, Silver Spring, Maryland 20901, Attention General Counsel, or to

Franchisee at  29 Third Street, New City, New York, 10956, Attn: Jeff A. Weinberger If Franchisee is a corporation or partnership, the Designated Representative shall be authorized to receive on behalf of Franchisee any written notice from Franchisor. Any notice by registered or certified mail shall be deemed to have been given and received at the date and time of mailing. Franchisee may change the Designated Representative by written notice to Franchisor.

### 17. Independent Contractor.

(a) Franchisee and Franchisor understand and agree that:

(1) This Agreement does not create a fiduciary relationship between them, that Franchisee will be an independent contractor, and that nothing in this Agreement is intended to constitute either party as an agent, legal representative, subsidiary, joint venturer, partner, employee, independent contractor or servant of the other for any purpose whatsoever.

(2) Nothing in this Agreement authorizes either party to make any contract, agreement, warranty, or representation on the other's behalf, or to incur any debt or other obligation in the other's name. Neither party shall, in any event, assume liability for, or be deemed liable hereunder as a result of any such action or omission of the other party, or any claim or judgment arising therefrom.

(3) Franchisee shall not represent in any proposed financing agreement or to any proposed lender or participant in a public or private investment offering that Franchisor or any of its affiliates is, or shall become, in any way responsible for Franchisee's obligation under such financing agreement, nor that it is, or shall be, participating in a private or public investment offering. Franchisee further agrees to submit to Franchisor a copy of any prospectus concerning a private or public offering in respect of Franchisee, and to obtain Franchisor's prior written approval (which approval shall be limited to the accuracy of references to Franchisor) prior to distributing any such prospectus, which approval shall not be unreasonably withheld or delayed.

(b) During the term of this Agreement, Franchisee shall hold itself out to the public as an independent contractor operating the Hotel pursuant to a franchise from Franchisor and as an authorized user of the Proprietary Marks. Franchisee agrees to take such affirmative action as may be necessary to do so, including but not limited to exhibiting a notice, in form satisfactory to Franchisor, in a conspicuous place in the lobby of the Hotel.

### 18. Attorneys' Fees.

In the event that any action is filed to enforce the terms and conditions of this Agreement, the prevailing party (as determined by the Court) shall be entitled to recover from the other party reasonable attorneys' fees and court costs. The parties agree that any money judgment rendered hereon shall provide for interest at the rate referred to in paragraph 2(e) until such amounts are paid.

### 19. Taxes, Permits; Compliance with Laws; Notice of Legal Actions.

(a) Franchisee shall promptly pay when due all taxes levied or assessed by any federal, state, or local tax authority, and any and all other indebtedness incurred by Franchisee in the operation of the Hotel Franchisee shall pay to Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax imposed on Franchisor with respect to any payments to Franchisor required under this Agreement

(b) In the event of any bona fide dispute as to liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with the

procedures of the taxing authority or applicable law. Franchisee shall not permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor to occur against the Hotel.

(c) Franchisee shall comply with all federal, state, and local laws, rules, and regulations. Franchisee shall timely obtain any and all permits, certificates, or licenses necessary for the Hotel, including licenses to do business, fictitious name registration and sales tax permits, health and sanitation permits, and ratings and fire clearances. Franchisee agrees to forward to Franchisor, within ten days of receipt, copies of all subsequent inspection reports, warnings, certificates, and ratings, received from any governmental entity during the term of this Agreement in connection with the Hotel.

(d) Franchisee shall notify Franchisor in writing within five days of receipt of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation or financial condition of the Hotel.

20. *Approval and Waivers.*

(a) Approvals and consents by Franchisor shall not be effective unless signed by an officer of Franchisor. Franchisor's consent, wherever required, may be withheld if any default by Franchisee exists under this Agreement.

(b) Except as otherwise set forth in this Agreement, Franchisor makes no warranties or guarantees upon which Franchisee may rely. Franchisor assumes no liability or obligation to Franchisee by providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any delay or denial of any request therefor.

(c) Failure to exercise any power or to insist upon strict compliance with any obligation or condition under this Agreement does not constitute a waiver of any future right to demand exact compliance with any of the terms herein. Waiver of any particular default shall not affect or impair a party's right with respect to any subsequent default of the same, similar, or different nature. No delay, forbearance, or omission to exercise any power or right arising out of any breach or default of any of the terms, provisions, or covenants hereof, shall affect or impair a party's right to exercise the same.

21. *Severability and Construction.*

(a) If, during the term of this Agreement, any provision of the Agreement is held to be illegal, invalid, or unenforceable under current or future laws: (1) such provision shall be fully severable; (2) this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never constituted a part hereof; and (3) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance. A similar provision to the severable provision, to the maximum extent enforceable, shall be automatically added as a part of this Agreement.

(b) Except as otherwise expressly provided herein, nothing in this Agreement is intended, nor shall anything herein be deemed, to confer upon any person or legal entity other than Franchisor or Franchisee, or such of their respective successors and assigns as may be contemplated by paragraph 10 hereof, any rights or remedies under or by reason of this Agreement.

(c) All captions in this Agreement are intended solely for the convenience of the parties and do not affect the meaning or construction of any provision.

(d) All references to the masculine, neuter, or singular, are construed to include the masculine, feminine, neuter, or plural. All acknowledgments, promises, covenants, agreements, and obligations made or undertaken by any Franchisee in this Agreement shall be deemed jointly and severally undertaken by all principals of Franchisee on behalf of one another.

(e) If Agreement is executed in multiple counterparts, each executed copy shall be deemed an original.

(f) This Agreement takes effect upon its acceptance and execution by Franchisor in the State of Maryland and shall be interpreted and construed under the laws thereof without reference to its conflicts of laws, which laws shall prevail in the event of any conflict of law.

(g) No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of the other right or remedy.

(h) Nothing contained in this Agreement shall bar either party's right to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

(i) This Agreement contains the entire agreement of the parties and supersedes any previous written or oral agreement and no representation, inducement, promise or agreement, oral or otherwise, not embodied herein, shall be of any force or effect.

(j) This Agreement may not be amended except by an agreement in writing signed by the parties hereto.

22. *Acknowledgements.*

(a) Franchisee acknowledges that Franchisee has conducted an independent investigation of the business franchised hereunder, that the business venture contemplated by this Agreement involves business risks, and that its success will be largely dependent upon the ability of Franchisee as an independent

business person. Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received from Franchisor or Franchisor's agents, any projection, warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement. Franchisor further disclaims the making of any projection, representation or guarantee that the Hotel will receive a specified number of reservations through the Franchisor's reservation system, or that the Hotel's reservations or revenues will achieve any specified number or increase by any specified percentage. By its execution hereof, Franchisee represents to Franchisor that it has neither received nor relied on representations of any kind concerning or relating to the franchise offering except as may be expressly set forth in writing in this Agreement.

(b) Franchisee acknowledges that this Agreement conveys no territorial rights or other promises of market allocation, that this Agreement does not limit Franchisor's right, or the rights of any of its affiliates, to use or license the System or part of the System or to engage in, or license others to engage in, any business activity at any other location. Furthermore, Franchisee acknowledges that Franchisor or its affiliates now or may in the future engage in transient lodging or related business activities which may be deemed to be competitive with the System or with the Hotel. Franchisee is acquiring no rights hereunder other than the right to use the System at the Hotel in accordance with the express terms of this Agreement.

(c) Franchisee acknowledges that the Proprietary Marks and this Agreement relate only to the System, that Franchisor operates other lodging systems, some of which may be competitive with the Hotel, and that services to the Hotel, including but not limited to the reservation system and directories, may be provided to one or more of such systems combined or separately.

(d) By the execution hereof, Franchisee acknowledges that it received from Franchisor the Basic Disclosure Document required by the Federal Trade Commission at the earlier of: (1) the Franchisee's first personal meeting with a representative of Franchisor to discuss the franchise sale; or (2) ten business days prior to the earlier of the execution of this Agreement or the payment of any consideration to Franchisor in connection with the sale of this franchise. Franchisee also acknowledges that it received, at the appropriate time, any disclosure document required under the laws of the state where Franchisee was domiciled at such time and where the Hotel is to be located. Franchisee further acknowledges that Franchisor gave the completed execution copies of this Agreement and any related agreements to the Franchisee at least five business days prior to actual execution by the Franchisee.

(e) Ordinary Business Control. Franchisor agrees that nothing herein contained is to take away from Franchisee the right to exercise ordinary business control, as the same is commonly understood, to the extent that such exercise is consistent with the specific terms of this Agreement. Franchisee acknowledges that it is solely responsible for the day-to-day operations of the Hotel.

23. Arbitration.

Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, including any claim that this Agreement or any part thereof is invalid, illegal, or otherwise voidable or void, shall be submitted to final and binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The substantive law of the State of Maryland shall be applied by the arbitrators. Judgment upon the arbitration award may be entered in any court having jurisdiction. This arbitration provision is self-executing and shall not be construed to limit any rights which Franchisor may have to apply to any court of competent jurisdiction for injunctive or similar provisional relief. In the event that any party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party notwithstanding the failure to appear. Parties to this Agreement agree that any arbitration shall be conducted at Franchisor's home office in Silver Spring, Maryland.

IN WITNESS WHEREOF, the parties have set their hands and seals as of the day above written consistent with Franchisor's requirement that each principal of Franchisee must sign and submit this document to Franchisor for its final execution.

ATTEST:                                          CHOICE HOTELS INTERNATIONAL, INC.

_Everett X L Casey_                              By: _____  L.S.
Everett F. Casey          2/5/93                 Joseph E. Lavin
Assistant Secretary                              Senior Vice President - Development

**ANY CORPORATE FRANCHISEE SIGN HERE.** Note that stockholders owning at least 70% of the stock must also sign below as an Individual Franchisee.

ATTEST:

RONDAVEL MANAGEMENT CORP.
a New York Corporation

By: _____ L.S.

Name: _____          Name: __Jeff A. Weinberger__

Title: _____          Title: __Vice President__

Date: _____

Place of
Execution: _____

**ANY LIMITED PARTNERSHIP FRANCHISEE SIGN HERE.** Note that each Individual general partner must also sign below as an Individual Franchisee.

WITNESS:

_____

Name: _____          By: _____ L.S.

Name: _____
General Partner

Date: _____

Place of
Execution: _____

**ANY GENERAL PARTNERSHIP FRANCHISEE SIGN HERE.** Note that each general partner must also sign below as an Individual Franchisee.

WITNESS:                                    FRANCHISEE:

_____

Name: _____
Title: General Partner
Date: _____
Place of
Execution: _____

_____

Name: _____
Title: General Partner
Date: _____
Place of
Execution: _____

_____

Name: _____
Title: General Partner
Date: _____
Place of
Execution: _____

ANY INDIVIDUAL FRANCHISEE SIGN HERE.

WITNESS:                                    FRANCHISEE:

_____          Name: _____
                                           Date: _____
                                           Place of
                                           Execution: _____

_____          Name: _____
                                           Date: _____
                                           Place of
                                           Execution: _____

_____          Name: _____
                                           Date: _____
                                           Place of
                                           Execution: _____

_____          Name: _____
                                           Date: _____
                                           Place of
                                           Execution: _____

**NOTE:** The person or business organization which is the title owner, as of the date of this Franchise Agreement, of the fee or leasehold interest in the real property on which the Hotel is located, must be a named Franchisee. The liability of all Franchisees shall be joint and several.

NY 188-QCI

### ADDENDUM

The Franchise Agreement ("Agreement") of even date by and between Choice Hotels International, Inc., a Delaware Corporation ("Franchisor") and Rondavel Management Corp., a New York Corporation ("Franchisee") is amended by the following:

1.    Franchisee agrees to make the following changes and additions to upgrade the Hotel or to cure existing deficiencies at the Hotel. **Such changes and additions will be completed to Franchisor's satisfaction no later than April 1, 1993.** Franchisee acknowledges that it is not authorized to use Comfort Inn's Marks prior to completion of such changes and additions and receipt of written authorization from Franchisor that such changes and additions have been completed to Franchisor's satisfaction:

   (a)    Replace all aged/mature shrubs.
   (b)    Replace fencing around dumpster and satellite dish.
   (c)    Replace lobby carpeting, wall vinyl and furniture.
   (d)    Replace cracked restaurant window.
   (e)    Replace hallway carpeting and wall vinyl.
   (f)    Replace wall vinyl in all meeting rooms.
   (g)    Replace carpeting in 3rd floor meeting rooms.
   (h)    Paint maids' carts.
   (i)    Replace all swag lamps in 3rd floor guest rooms with floor lamps.
   (j)    Replace all worn and faded guest room carpeting.
   (k)    Replace 50 TVs with new remote control units.
   (l)    Replace all damaged lamp shades.
   (m)    Replace all damaged bathroom mirrors.
   (n)    Install Franchisor's 2001 Reservation System.
   (o)    Purchase and install approved Comfort Inn signage.

2.    Franchisee agrees to make the following changes and additions to upgrade the Hotel to meet the standards of Franchisor or to cure existing deficiencies after entering the Comfort Inn System, according to the following schedule:

### BY APRIL 30, 1993:

   (a)    Replace all casegoods in 3rd floor guest rooms.
   (b)    Replace 50 bedspreads.
   (c)    Replace 50 draperies.

**\*Franchisee agrees to provide to Franchisor executed purchase contracts showing anticipated delivery dates of items (a)-(c) prior to the Commencement Date\***

### BY OCTOBER 1, 1993:

   (d)    Renovate building exterior on porte cochere side to match building front (ie. columns with middle peak and Sunburst logo.

Addendum (NY 188-QCI)
Page 2


3.  Franchisor agrees to waive the following requirements:

    (a)  double lane porte cochere - existing is single lane
    (b)  continental breakfast - so long as full service
         restaurant is available for guests' use

4.  Franchisee acknowledges and agrees that the changes and
additions set forth in paragraphs 1 and 2 are in addition to
Franchisee's continuing obligation to comply with the Rules and
Regulations pursuant to paragraph 6 of the Agreement.

5.  Franchisee represents and warrants to Franchisor that
Franchisee is not party to any contract which would conflict with
this Agreement.   If the Hotel is presently operated under a
franchise agreement with another Franchisor, this Agreement is
contingent upon Franchisee furnishing verification satisfactory to
Franchisor within thirty (30) days, but in any event prior to
entering the System, evidencing Franchisee's right to terminate
such other franchise.   Furthermore, Franchisee agrees to defend,
indemnify and hold Franchisor harmless against any claims losses,
or liabilities which may be asserted against Franchisor by such
other Franchisor arising out of or related to the termination of
such other franchise, including tortious interference with
contractual relations or similar claims.

6.  Franchisor will not grant another Comfort Inn franchise
during the term of this Agreement within the boundaries of Rockland
County, New York (as they currently exist) to include the area
outlined below:

        "to the western border of Orange County, to the east at
        the Hudson River, to the southern border of Bergen County,
        New Jersey and to the north border of Rockland County, New
        York."   (SEE MAP ATTACHED HERETO AS EXHIBIT A)

        Franchisee acknowledges that this right shall become null and
void and shall not be reinstated if any of the fees in connection
with this Agreement become more than 60 days delinquent or if the
Hotel receives a failing Quality Assurance Inspection score.   This
right is exclusive to Rendavel Management Corp. (or Transferee as
outlined in Paragraph 8 below) and is not transferable to any other
party.   Nothing herein shall prevent Franchisor from granting a
franchise for a trade name other than COMFORT INN.   Franchisee
further acknowledges that the protected territory excludes any
hotels for which Franchisor has an executed application or
Franchise Agreement as of the date hereof. Franchisor repre

Addendum (NY 188-QCI)
Page 3

7.    Notwithstanding anything to the contrary set forth in paragraph 10 of the Agreement, Franchisor will ~~not unreasonably withhold its~~ consent in the event Franchisee desires to transfer ~~or~~ this ^(ment, or to) sell stock among members of the Weinberger family or to or from any corporations, partnerships or trusts created, controlled or maintained for the benefit of Weinberger family members. Franchisor further agrees that there will be no fee in connection with such transfer. Any transfer or sale of stock of the franchisee amounting to less than 50% of the then issued and outstanding stock of the franchisee shall ~~not~~ not be deemed an assignment or sale for the purposes of this agreement.

8.    Notwithstanding anything to the contrary set forth in paragraph 10 of the Agreement, if the Hotel is sold then paragraph 10(c)(5) is amended to provide the affiliation fee shall be $10,000.00, unless such sale is to any member of the Weinberger family or to any corporation ^(rdneiship or trust,) created, controlled or maintained for their benefit, or where such member(s) control at least 50%.

9. Franchisee shall have the right to transfer this Franchise Agreement from the Hotel to a New Hotel that may be constructed within the territory outlined in paragraph 6 above, with the same terms and conditions of this Agreement, so long as:  (a) the New Hotel conforms in every way to Comfort Inn's then-current Rules and Regulations, (b) the New Hotel contains at least 80% of the number of rooms of the Hotel, and (c) Rondavel Management Corp. or its affiliates, retain ownership of the New Hotel, which include members of the ^(or successors) Weinberger family.

Upon Commencement of Operations of the New Hotel under this Agreement, this Agreement shall be terminated as to the Hotel. In such event,  Franchisee agrees to consider applying to reposition the Hotel to one of Franchisor's other hotel brands.

~~Franchisee acknowledges that this right shall become null and void and shall not be reinstated if any of the fees in connection with this Agreement become more than 50 days delinquent or if the Hotel receives a failing Quality Assurance Inspection score.~~

IN WITNESS WHEREOF, the parties hereunto have set their hands and seals.


ATTEST:                                CHOICE HOTELS INTERNATIONAL, INC.

Everett F. Casey                       By_____ L.S.
Assistant Secretary  2/9/93               Joseph E. Lavin
                                          Senior Vice President - Development

WITNESS/ATTEST:                        RONDAVEL MANAGEMENT CORP.
                                       a New York Corporation

_____ X             By_____ L.S. X
                                          Jeffy K. Weinberger
                                          Vice President



Exhibit A